IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

W. BRAND BOBOSKY, and WE NOT ME,
LTD.,

        Plaintiff,

                                     CV 10-630-PK

                                     OPINION AND ORDER

v.

ADIDAS AG d/b/a THE ADIDAS GROUP,
ADIDAS AMERICA, INC., 180LA, LLC,
NBA PROPERTIES, INC., NBA MEDIA
VENTURES, LLC, BANNER SEVENTEEN
LLC d/b/a THE BOSTON CELTICS, and
KEVIN GARNET

        Defendants.

_____

PAPAK, Judge:

        Plaintiffs W. Brand Bobosky and We Not Me, Ltd. (collectively "Bobosky" or

"plaintiffs") bring this action against defendants adidas America, Inc., adidas AG, 180LA, LLC,

NBA Properties, Inc., NBA Media Ventures, LLC, and Kevin Garnett (collectively "adidas" or

"defendants") arising out of defendants' use of the phrase "WE NOT ME" during a 2007

Page 1- OPINION AND ORDER

"Basketball is a Brotherhood" marketing campaign. Bobosky alleges claims for trademark infringement and unfair competition, based on his two federal trademark registrations of "WE NOT ME." (Third Amend. Compl., #101.) Now before the court is adidas' motion for partial summary judgment (#138) on the issue of trademark validity. For the reasons discussed below, the motion is granted in part and denied in part.

## BACKGROUND[1]

### I.        Genesis and Promotion of WE NOT ME

W. Brand Bobosky is an attorney in private practice in Naperville, Illinois. (Bobosky Decl., #168-1, ¶2.)  In 2000, Bobosky came up with the idea of "WE NOT ME" and in June of that year placed the phrase and a corresponding symbol on 200 lapel pins, which he distributed at his induction as the Naperville Rotarian President. *Id.* at ¶6.  Over the next 11 years, promoting "WE NOT ME" became Bobosky's "life passion." *Id.* at ¶5. Bobosky initially engaged in various attempts to bring the phrase to public attention by distributing items displaying the

_____

[1] The following recitation constitutes my construal of the evidentiary record in light of the legal standard governing motions for summary judgment under Federal Civil Procedure Rule 56. That is, in construing the record I view the evidence and all factual inferences drawn from the underlying facts in the light most favorable to the non-moving party, for purposes of the motion now before the court only. *See, e.g., T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Asso.*, 809 F.2d 626, 630-631 (9th Cir. 1987) ("[A]t summary judgment, the judge must view the evidence in the light most favorable to the nonmoving party: if direct evidence produced by the moving party conflicts with direct evidence produced by the nonmoving party, the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact. . . . Inferences must also be drawn in the light most favorable to the nonmoving party. Inferences may be drawn from underlying facts that are not in dispute, such as background or contextual facts, . . . and from underlying facts on which there is conflicting direct evidence but which the judge must assume may be resolved at trial in favor of the nonmoving party.") (citations omitted).

phrase and encouraging celebrities to publicize it. He continued these efforts for years.[2] In February 2004, he also began advertising WE NOT ME in a local monthly publication with a circulation of 35,000 called "Positively Naperville," and continues his monthly advertisements there to date. *Id.* at ¶11. In March 2004, Bobosky hired a law firm to apply for federal copyright and state and federal trademarks for the phrase, making his first trademark application in August 2004. *Id.* at ¶12. In November 2004, Bobosky incorporated We Not Me, Ltd. in Illinois, a business with the goal of advertising "WE NOT ME" for sale or licensing. *Id.* at ¶13. He created a website soon after – www.wenotme.us – which has remained online since then, and which currently sells WE NOT ME merchandise. *Id.* at ¶¶, 15, 32.

## II.        Trademark Registrations

adidas' motion focuses on Bobosky's two federally registered trademarks for "WE NOT ME"– U.S. Trademark Registration No. 3,118,177 (the "'177 Registration") and U.S. Trademark Registration No. 3,742,940 (the "'940 Registration").

### A.        '177 Registration

On August 31, 2004, Bobosky submitted his first application to register the phrase "WE NOT ME" under the intent-to-use provisions of §1(b) of the Lanham Act, 15 U.S.C. §

---

[2] In 2001 and 2002, Bobosky distributed several hundred key chains. In 2003 he encouraged Oprah Winfrey and Regis Philbin to embrace the message. *Id.* at ¶¶7-9. In 2004, 2005, and 2007, he distributed over ten thousand beer cups bearing the phrase at the Naperville Oktoberfest. *Id.* at ¶¶13,20. In 2005 he distributed over 60 caps to Rotarians at a convention in Chicago. In April and May 2006, he bought lapel pins, money clips, key chains, and golf ball markers to sell. *Id.* at ¶¶21,22. That summer he also distributed hundreds of lapel pins to community businesses and ordered more items, including caps and necklaces for sale at the "Positively Naperville" store. ¶¶23,24. He also sent letters to non-profits, businesses, and celebrities such as the board of Wal-Mart, Bill and Melinda Gates, and Michael Moore. Bobosky even commissioned a song to be written entitled "WE NOT ME."

1051(b).[3] (Feldman Decl., #141, Ex. F.)   Bobosky's application asserted a bona fide intention to

use the mark in commerce on or in connection with the following list of goods in International

Class 25:

> men's, women's and children's clothing, namely, sweatshirts, sweatpants, shirts, tank
> tops, jeans, jackets, coats, slacks, suits, hats, headbands, visors, caps, dresses, shoes,
> sneakers, boots, wristbands, socks, t-shirts, belts, belt buckles, undergarments,
> neckties, dress shirts, collared shirts, rubgy [sic] shirts, ties, knit shirts, shorts and
> sandals.

(Feldman Decl., #141, Ex. F, at 4.)   Additionally, the application appointed attorney John

_____

[3] Section 1(b) provides:
> (1) A person who has a bona fide intention, under circumstances showing the
> good faith of such person, to use a trademark in commerce may request
> registration of its trademark on the principal register hereby established by paying
> the prescribed fee and filing in the Patent and Trademark Office an application
> and a verified statement, in such form as may be prescribed by the Director.
>
> (2) The application shall include specification of the applicant's domicile and
> citizenship, the goods in connection with which the applicant has a bona fide
> intention to use the mark, and a drawing of the mark.
>
> (3) The statement shall be verified by the applicant and specify--
>
>> (A) that the person making the verification believes that he or she, or the
>> juristic person in whose behalf he or she makes the verification, to be
>> entitled to use the mark in commerce;
>>
>> (B) the applicant's bona fide intention to use the mark in commerce;
>>
>> (C) that, to the best of the verifier's knowledge and belief, the facts recited
>> in the application are accurate; and
>>
>> (D) that, to the best of the verifier's knowledge and belief, no other person
>> has the right to use such mark in commerce either in the identical form
>> thereof or in such near resemblance thereto as to be likely, when used on
>> or in connection with the goods of such other person, to cause confusion,
>> or to cause mistake, or to deceive.

15 U.S.C. § 1051(b).

Ambrogi– Bobosky's intellectual property counsel– to submit the application on his behalf. *Id.* Ambrogi prepared the list of goods included in the application and signed the application on behalf of Bobosky. *Id.* at 5; (Feldman Decl., #141, Ex. B, at 2,3). In fact, Bobosky never specifically asked for a registration as to "each and every one" of the goods; he assumed that "it just comes with the territory" and that the patent and trademark office had "thow[n] them in the class." (Feldman Decl., #141, Ex. B, at 4,5.)

On April 3, 2006, Bobosky's attorney filed a Statement of Use, as required by §1(d), asserting that mark WE NO ME had been first used in commerce "at least as early as" October 2004 and was currently in use in commerce. (Feldman Decl., #141, Ex. I, at 3.) He also submitted a specimen showing the mark as it was used: a picture of a hat with the phrase "WE NOT ME" embroidered on the back. *Id.* at 5. Finally, he attested that Bobosky was using the mark in commerce on or in connection with "all goods and/or services" listed in his application.

In depositions for this case, Bobosky admitted that, in fact, he was not using the mark in commerce in connection with all the goods listed in his application when the Statement of Use was submitted in April 2006. (Feldman Decl., #141, Ex. B at 9.) Moreover, Bobosky admitted that he first used WE NOT ME on hats in May 2005, not October 2004 as suggested by the Statement of Use, although the mark was in use on pins and key chains by 2004. (Feldman Decl., #141, Ex. A at 4, Ex. B at 15.) Bobosky noted, however, that Mr. Ambrogi filed the Statement of Use on his behalf and that Ambrogi made the false statement concerning the extent of use without his knowledge. *Id.* Bobosky was also unclear about whether Ambrogi knew the Statement of Use contained false assertions when he submitted it. *Id.* In July 2006, the USPTO issued the '177 Registration.

In November and December 2007, a different attorney representing Bobosky, John Sopuch, contacted adidas claiming that adidas' use of the phrase "We Not Me" in a basketball marketing campaign violated both a copyright Bobosky possessed for the poem entitled "We Not Me" and Bobosky's trademark of that phrase. (Backman Decl., #140, ¶¶4,5.) adidas' in-house intellectual property counsel researched Bobosky' '177 Registration and could not find any use of the mark by Bobosky or his company on any of the goods listed in the Statement of Use, except on baseball caps. *Id.* at ¶7. Consequently, adidas' counsel told Bobosky's attorney that her investigation showed Bobosky' statement of use contained false assertions and threatened to challenge the validity of the We Not Me mark if Bobosky did not drop his allegations of trademark infringement. *Id.* at ¶8. After that conversation, Bobosky discussed amending his trademark registration with his attorney and ultimately submitted a Post-Registration amendment in March 2008, removing all items except hats from the recitation of goods. (Feldman Decl., #141, Ex. B at 11, 12, Ex. J.) Bobosky confirmed that he amended his registration only after adidas accused him of perpetrating a fraud on the trademark office. (*Id.*; Ex. B at 13-14.)

## B.    '940 Registration

In March 2008, Bobosky's attorney filed for a second trademark application, also under the intent-to-use provision, asserting a bona fide intent to use WE NOT ME" in connection with "hats, clothing, namely, shirts, and footwear" in International Class 25. Bobosky filed this second application to "protect [himself] in other areas . . . clothing and footwear" because he predicted adidas or another company would try to use WE NOT ME in those areas. (Feldman Decl., #141, Ex. B at 16.) As of his March 2008 application, Bobosky testified that he generally planned to "apply the trademark to all levels of clothing, from top to bottom, hats, to clothes on

Page 6- OPINION AND ORDER

the body, to their feet that they walk in," yet Bobosky had no specific plans to create We Not Me

footwear or clothing products. *Id.* at 17-18.

In November 2009, Bobosky's attorney filed a Statement of Use connected to the

March 2008 application declaring that WE NOT ME had been in use since October 2004 with

hats and since October 7, 2009 with shirts and footwear. (Feldman Decl., #141, Ex. J at 4.) Also

included were copies of pages from a website selling WE NOT ME apparel, including hats, t-

shirts, and flip-flop sandals. *Id.* at 6-13. On the basis of the Statement of Use, the PTO granted

Bobosky's application for the '940 Registration in January 2010.

## LEGAL STANDARDS

Summary judgment is appropriate "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." Fed. R. Civ. P. 56(c). Summary judgment is not proper if material factual issues

exist for trial. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 318, 322 (1986); *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir.

1995), *cert. denied*, 116 S.Ct. 1261 (1996). In evaluating a motion for summary judgment, the

district courts of the United States must draw all reasonable inferences in favor of the nonmoving

party, and may neither make credibility determinations nor perform any weighing of the

evidence. *See, e.g., Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-55 (1990); *Reeves v.

Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).

## DISCUSSION

adidas moves for summary judgment on Bobosky's claims for trademark

infringement and unfair competition under the Lanham Act arguing that because Bobosky's

federal trademark registrations are both void *ab initio* and invalid by virtue of being procured

through fraud on the PTO, Bobosky lacks a valid and enforceable trademark in WE NOT ME.

adidas also contends that Bobosky has no rights in WE NOT ME as an unregistered trademark

because he failed to use the mark in a trademark manner, that is, to identify the source of his

products. Because I find that Bobosky's federal registrations are void *ab initio*, I grant summary

judgment for adidas on Bobosky's trademark infringement claim under §32 of the Lanham Act

and therefore decline to address adidas' allegations of fraud on the PTO.[4]  I also conclude,

however, that there remains a genuine issue of material fact as to whether Bobosky acquired

valid and protectable rights in WE NOT ME mark through trademark use.  Therefore, I deny

adidas' motion for summary judgment on Bobosky's unfair competition claim under § 43(a) of

the Lanham Act.

I.        **Validity of Federal Trademark Registrations**

          A.         **Void *Ab Initio***

                    adidas raises what amounts to three distinct void *ab initio* arguments.  First, adidas

contends that Bobosky's '177 and '940 registrations are void *ab initio* because Bobosky lacked

the bona fide intent to use WE NOT ME on all the goods listed in his initial intent-to-use

applications.  Second, adidas argues that the '177 registration is void *ab initio* because Bobosky

---

[4] adidas' arguments of void *ab initio* and fraud on the PTO would also support its counterclaim for cancellation of Bobosky's federal registrations pursuant to 15 U.S.C. § 1119. However, adidas does not move for summary judgment on that counterclaim and even suggested previously that it would voluntarily dismiss its counterclaim if it prevailed on its motion for partial summary judgment.  Thus, the issue of whether Bobosky's federal registrations should be cancelled is not properly before the court at this juncture and will be taken up later if necessary.

failed to actually use all the goods in commerce, as attested in his Statement of Use filed in April 2006. Third, adidas contends that the '177 and '940 registrations are void *ab initio* because Bobosky misstated the first use date for WE NOT ME in the Statements of Use for both his registrations. Because I agree with adidas's first argument – that Bobosky lacked the requisite bona fide intent to use his mark in commerce – I need not consider the others.

1.      **Lack of Bona Fide Intent to Use Mark in Commerce on**

**All Items as Asserted in Initial Applications for '177 and**

**'940 Registrations**

adidas contends that Bobosky's '177 and the '940 registrations are void *ab initio* because Bobosky lacked the bona fide intent to use WE NOT ME on all the goods listed in his initial intent-to-use applications. A bona fide intent to use the mark in commerce is a statutory requirement of a valid intent-to-use trademark application under § 1(b) of the Lanham Act. *See* 15 U.S.C. § 1051(b)(1) ("person who has a bona fide intention, under circumstances showing the good faith of such person, to use a trademark in commerce may request registration of its trademark on the principal register"); *Aktieselskabet AF 21. November 2001 v. Fame Jeans Inc.*, 525 F.3d 8, 21 (D.C. Cir. 2008). Section 1(b) requires both actual intent to use the mark in commerce and evidence that objectively demonstrates such an intent. *Aktieselskabet,* 525 F.3d at 21 (citing *Wet Seal, Inc. v. FD Mgmt., Inc.*, 82 U.S.P.Q.2d 1629, 1633 (T.T.A.B. 2007) and *Commodore Elecs. Ltd. v. Cbm Kabushiki Kaisha*, 26 U.S.P.Q.2d 1503, 1507 (T.T.A.B. 1993)).

An applicant's subjective testimony about his state of mind cannot demonstrate that he possessed a bona fide intent to use the mark. *Lane Ltd. v. Jackson Int'l Trading Co.*, 33 U.S.P.Q.2d 1351, 1355 (1994) (an "applicant's mere statement of subjective intention, without

more, would be insufficient to establish applicant's bona fide intention to use the mark in commerce"). Typically, an applicant demonstrates his bona fide intent to use by producing "a written plan of action" for a new product or service. 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition,* § 19:14, at 19-46, 47 (4th ed. rev. 2011) ("*McCarthy*"). If there is an absence of documentary evidence showing the applicant's intent to use the mark, the burden shifts to the applicant to adequately explain that lack of documentary evidence. *McCarthy,* § 19:14, 19-47; *Boston Red Sox Baseball Club Ltd. P'ship v. Brad Francis Sherman,* 88 U.S.P.Q.2d 1581, 1587 (2008). By itself, the absence of contemporaneous documents indicating an intent to use is sufficient to prove an applicant's lack of bona fide intent. *See Commodore,* 26 U.S.P.Q.2d at 1507.

A lack of bona fide intent to use is a ground for an *inter partes* opposition proceeding to an application before the Trademark Board. *Aktieselskabet,* 525 F.3d at 21; *McCarthy* § 20:21, at 20-65,66. Lack of bona fide intent to support an intent-to-use application also may render an application void *ab initio* upon challenge in federal district court. *See Caesars World, Inc. v. Milanian,* 247 F. Supp. 2d 1171, 1192–93 (D. Nev. 2003) ("Milanian's intent to use applications for COLOSSEUM and EMPIRE were not made with a bona fide intent to use and are void.")

Here, I find that Bobosky lacked a bona fide intent to use his mark in commerce on each item, including hats, listed in his first intent-to-use application. Since Bobosky amended his '177 registration to remove all items except hats, the only relevant inquiry is whether Bobosky intended to use the mark on hats at the time of his initial August 2004 application. Since Bobosky admits in depositions that he did not even create the list of goods appearing in that

application, he effectively concedes that he lacked the bona fide intent to use WE NOT ME on each of those items, including hats. Accordingly, I conclude that Bobosky's '177 registration of WE NOT ME for use on hats is void *ab initio*.

The analysis for Bobosky's second intent-to-use application is slightly more complicated, but reaches the same result. In that application dated March 19, 2008, Bobosky asserted through his attorney a bona fide intent to use WE NOT ME on hats, shirts, and footwear. It is undisputed that Bobosky actually used WE NOT ME on hats in May 2005, placing an order for 144 hats from Minuteman Press on May 5, 2005. (Feldman Decl., #141, Ex. B at 15.) Thus, there is no question that Bobosky possessed the requisite intent to use the mark as to hats. Bobosky, however, offers conflicting testimony about his intent to use the mark on shirts and footwear. Bobosky testified that as of March 2008 he had "[n]o plans" to create WE NOT ME clothing or footwear because he had "[n]o need to," since he had not yet acquired a trademark. *Id.* at 18. Yet he also stated that prior to his March 2008 application he had called two companies about producing WE NOT ME clothing and footwear, but did not receive written price quotes or proposals from them. *Id.* at 19. In light of this contradictory testimony, Bobosky's attempt to explain why he lacked documentary evidence of his intent to use the mark on shirts and footwear is insufficient to carry his burden on that issue. *See Boston Red Sox*, 88 U.S.P.Q.2d at 1587 (rejecting applicant's explanation for his lack of documentary evidence of bona fide intent as "simply not credible"). Therefore, I conclude that Bobosky did not possess a bona fide intent to use his mark on shirts and footwear as asserted in his March 2008 application.

A recent ruling of the Trademark Board indicates that proof of a lack of bona fide intent to use even one item in a class of goods on an intent-to-use application invalidates the

Page 11- OPINION AND ORDER

application for that entire class.[5] *See Spirits Int'l, B.V. v. S.S. Taris Zeytin Ve Zeytinyagi Tarim Satis Kooperatifleri Birligi*, 99 U.S.P.Q.2d 1545, 1549, 1550 n.3 (2011) ("to the extent that opposer is successful in proving . . . lack of a bona fide intention to use the mark with respect to any of the goods in each class . . . the opposition against the classes in their entirety would be sustained."). Thus, Bobosky's '940 registration as a whole is void *ab initio* because he lacked the bona fide intention to use his mark on two out of three items within International Class 25 listed on that application.

## II.        Validity of Unregistered Trademark

Even though I agree with adidas that Bobosky's federal registrations are both void *ab initio*, I must further analyze whether Bobosky has acquired a valid *unregistered* trademark. Possession of a federally registered trademark is not required to succeed in an action under § 43(a) of the Lanham Act, one of the two claims brought by Bobosky. As the Ninth Circuit recently explained, failure to provide evidence of a federal registration for a trademark, "while

---

[5] This rule stands in tension with *Grand Canyon West Ranch LLC v. Hualapi Tribe*, 78 U.S.P.Q.2d 1696, 1697 (T.T.A.B.1985), holding that, absent proof of fraud, a false statement of use for a use-based will invalidate the registration for only the items not actually used in commerce, not that entire class of items. Indeed, cases of the Board predating *Spirits International* extend the more forgiving *Grand Canyon* rule to intent-to-use applications as well. *See, e.g. Wet Seal, Inc. v. FD Mgmt., Inc.*, 82 U.S.P.Q.2d 1629, 2 (OPPOSITION 91157002) ("An [intent-to-use] application will not be deemed void for lack of a bona fide intention to use absent proof of fraud, or proof of a lack of bona fide intention to use the mark on all of the goods identified in the application, not just some of them"). The Board in *Spirits International* apparently recognized that tension, and briefly distinguished *Grand Canyon* as a case where the applicant affirmatively moved to amend its identification to remove the challenged items. 99 U.S.P.Q.2d 1545, 1550 n.3. I do not find this distinction particularly compelling nor can I discern a policy rationale for construing an intent-to-use application so much more strictly against the applicant than a use-based application. However, since *Spirits International* is the most recent precedential opinion of the Board on this issue, I afford it persuasive weight.

detrimental to [plaintiff's] trademark claim, does not completely resolve it." *Fleischer Studios, Inc. v. A.V.E.L.A., Inc.*, 654 F.3d 958, 966 (9th Cir. Aug. 19, 2011). That is because a claim under § 43(a) requires only proof of a "valid, protectable trademark," not necessarily a *federally registered* trademark. *Brookfield*, 174 F.3d at 1046, 1047 n.8 ("Whereas section 32 provides protection only to registered marks, section 43(a) protects against infringement of unregistered marks and trade dress as well as registered marks"). Pursuing a § 43(a) claim, "a claimant may still prove the validity of an unregistered mark" but must do so without "the presumption of validity that registration confers."[6] *Id.*

### A.        Trademark Use

The parties dispute whether Bobosky has actually used WE NOT ME in a trademark manner. adidas insists that Bobosky used WE NOT ME on hats, shirts, and flip-flops as mere decoration and ornamentation, while Bobosky contends that WE NOT ME serves the trademark purpose of identifying We Not Me, Ltd. as the source of those items.[7]

In general, one must use a mark in order to acquire trademark rights. *See Hanover*

---

[6] Federal registration provides "prima facie evidence" of the mark's validity and entitles the plaintiff to a "strong presumption" that the mark is a protectable mark. *Zobmondo Entm't, LLC v. Falls Media, LLC*, 602 F.3d 1108, 1113 (9th Cir. 2010) (citing 15 U.S.C. §§ 1057(b), 1115(a); *KP Permanent Make–Up, Inc. v. Lasting Impression I, Inc.*, 408 F.3d 596, 604 (9th Cir. 2005)).

[7] adidas focuses only on Bobosky's use of WE NOT ME on t-shirts, hats, and flip-flops, the uses described in his amended '177 registration and his '940 registration. In addition to those items, it appears Bobosky produced WE NOT ME pins, money clips, golf ball markers, and jewelry to sell. Thus, he argues that even if his use of WE NOT ME was ornamental on shirts, hats, and sandals, it might not have been on the other items. Bobosky, however, does not produce any evidence showing how his mark was actually displayed on those other items. I therefore consider only whether his use of WE NOT ME on hats, shirts, and sandals served a trademark purpose.

Page 13- OPINION AND ORDER

*Star Milling Co. v. Metcalfe*, 240 U.S. 403 (1916). But, as Professor McCarthy teaches, "not every single work, phrase, design or picture that appears on a label or in an advertisement qualifies as a protectable mark or trade dress." *McCarthy*, §3:3, at 3-6. Rather, only use of a mark to identify the goods as coming from a certain source and distinguish it from other sources qualifies as trademark use. *See* 15 U.S.C. § 1127 (defining trademark as "any word, name, symbol, or device, or any combination thereof," which serves "to identify and distinguish [the] goods [of the mark's owner] ... from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown."); *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 342 (4th Cir. 2001) (holding that if the designation does not perform the job of identification, then it is not protectible as a trademark); *McCarthy*, §3:3, at 3-6, §16:1 at 16-5,6. Such trademark use is required to prove both trademark infringement of a registered mark and unfair competition based on an unregistered trademark. *See Rock & Roll Hall of Fame & Museum, Inc. v. Gentile Prods.*, 134 F.3d 749, 753 (6th Cir. 1998) ("whether alleging infringement of a registered trademark, pursuant to 15 U.S.C. § 1114(1), or infringement of an unregistered trademark, pursuant to 15 U.S.C. § 1125(a)(1), it is clear that a plaintiff must show that it has actually used the designation at issue as a trademark").

Merely because a design, symbol, or designation is decorative or ornamental does not mean that it cannot also serve the trademark purpose of identifying the source of the goods that bear it. *McCarthy*, § 7:24, at 7-57. Indeed, as one court observed, "[w]ords can, in some situations, serve both an ornamental and a trademark function." *Ithaca Indus., Inc. v. Essence Commc'ns, Inc.*, 706 F. Supp. 1195, 1206–207 (W.D.N.C. 1986). But, if a designation is *solely* ornamental, it cannot be a trademark. *Go Pro Ltd. v. River Graphics, Inc.*, 2006 WL 898147, at

*4 (D. Colo. Apr. 5, 2006) (citing *McCarthy*, § 7:24).   Whether a plaintiff uses a designation merely as ornamentation or also to indicate origin is a question of fact.   *See Application of Mogen David Wine Corp.*, 328 F.2d 925, 932 (Cust. & Pat. App. 1964) (whether bottle design functioned as trademark to indicate origin was a question of fact); *In re Tilcon Warren, Inc.*, 221 U.S.P.Q. 86, 88 (1984) ("the determination of whether subject matter for registration serves or does not serve to indicate origin is a fact question").

In oral argument, adidas contended that Bobosky's embroidering of WE NOT ME onto shirts and hats bearing the labels of the other companies that manufactured those items was completely ornamental and could never qualify as trademark use.  adidas claimed that, as a matter of law, the only way one can properly use a trademark on a shirt or similar item is by placing that mark on the item's label or associated hang tag, unless the owner of the mark is a company so well-know that a vast number of consumers already associated it with the mark. adidas provides no authority to support this position, either in briefing or during argument, and I find it to be completely at odds with the leading cases to address the issue.

It is well-established that even use of a mark as ornamentation on apparel manufactured by others qualifies as trademark use as long as the mark also serves the trademark purpose of identifying the source of the product.   The Board first clearly articulated this principle in *In re Olin Corp.*, 181 U.S.P.Q. 182 (1973), a case where plaintiff sought to register a stylized "O" for use on t-shirts, but registration was refused on the basis that the mark was used as mere ornamentation.   On appeal, the Board recognized that marks ornamenting t-shirts, even those manufactured by others, can also serve a trademark function by identifying the item's "secondary source":

Page 15- OPINION AND ORDER

It is a matter of common knowledge that T-shirts are "ornamented" with various insignia, including college insignias, or "ornamented" with various sayings such as "Swallow Your Leader". In that sense what is sought to be registered could be construed to be ornamental. If such ornamentation is without any meaning other than as mere ornamentation it is apparent that the ornamentation could not and would not serve as an indicia of source. Thus, to use our own example, "Swallow Your Leader" probably would not be considered as an indication of source.

The "ornamentation" of a T-shirt can be of a special nature which inherently tells the purchasing public the source of the T-shirt, not the source of manufacture but the secondary source. Thus, the name "New York University" and an illustration of the Hall of Fame, albeit it will serve as ornamentation on a T-shirt will also advise the purchaser that the university is the secondary source of that shirt. It is not imaginable that Columbia University will be the source of an N.Y.U. T-shirt. Where the shirt is distributed by other than the university the university's name on the shirt will indicate the sponsorship or authorization by the university.

*Id.* at 182.  Consequently, the Board concluded that because the stylized "O" both ornamented the applicant's shirts and served as "an indication of a secondary source of origin," the symbol functioned as a trademark. *Id.* at 182-183.

The Board has also extended this holding to words used on t-shirts, relying on the same notion that a mark can simultaneously ornament and identify source. In *In re Expo '74*, 189 U.S.P.Q. 48 (T.T.A.B. 1975), Expo '74, a corporation organizing the 1974 World's Fair in Spokane, Washington, applied to register the mark EXPO '74 for use across the front of t-shirts manufactured by another entity. *Id.* at 48.  The registration was refused because the shirts did not use the phrase EXPO '74 in a trademark manner. *Id.* at 49.  The Board first reiterated that a trademark may be affixed to goods manufactured by others:

There is no question that a party is not required to manufacture products to own and register a trademark. In fact, any person in the normal channels of distribution including a manufacturer, a contract purchaser who has goods manufactured for him, and a retailer or merchant as well as any nonprofit organizations or institution can be the owner of a trademark "in commerce" if he applies or has someone in his behalf

> apply his own trademark to goods to which he has acquired ownership and title and sells or merely transports such goods in commerce as his own product with the mark, as applied thereto, serving to identify the particular product as emanating from the shipper or seller in his own capacity.

*Id.* The Board then explained that there is no "prescribed method or place for affixation of a mark to goods," and that even affixing a mark across the front of a garment, as Expo '74 did on its shirts, could serve as trademark use so long as the mark "performs the function of a trademark by signifying to purchasers and prospective purchasers the goods of a particular entity and distinguishing such goods from those of others."[8] *Id.* at 49.  Relying heavily on its prior analysis in *Olin*, the Board reversed refusal of the registration because the use of EXPO '74 on the front of t-shirts indicated the origin of those goods.  *Id.*

The Board has since reiterated this principle in *In re Paramount Pictures Corp.*, 213 U.S.P.Q. 1111 (T.T.A.B.1982), holding that the words "Mork & Mindy" appearing below a design were not merely ornamental on t-shirts because they indicated a secondary source of sponsorship, the television show Mork & Mindy, not the manufacturer of the shirts.  Many authorities continue to cite *Paramount Pictures* for the proposition that a mark can identify a secondary source of the product in addition to ornamenting it.  *See, e.g., Go Pro Ltd.*, 2006 WL 898147, at *4; *In re Watkins Glen Int'l, Inc.*, 227 U.S.P.Q. 727, 728 (1985); Trademark Man. of Exam. Proc. § 1202.03 (8th ed. 2011) ("TMEP").

When the court asked adidas during oral argument whether placing a mark on a shirt

---

[8] Thus, adidas' insistence that a mark may serve a source-identifying function only when affixed to a shirt's label or hang tag seems to ignore this explicit language of the Board in *Expo '74*.

manufactured by another could serve to identify the "secondary source" of the shirt, adidas responded somewhat disdainfully that it did not even understand the court's question because it knew of no such concept in trademark law. adidas can no longer remain ignorant of this well-established principle. As the foregoing discussion demonstrates, the fact that Bobosky embroidered WE NOT ME in various places on t-shirts and hats bearing the labels of other companies does not necessarily mean that he used WE NOT ME solely as ornamentation.

Here, Bobosky contends that because WE NOT ME corresponds with the corporate name of We Not Me, Ltd., use of WE NOT ME on apparel in fact indicates the secondary source of those goods. Case law is mixed on this issue. In *In re Paramount Pictures Corp.*, 217 U.S.P.Q. 292 (1983), the Board implicitly endorsed the notion that a mark consisting of a corporate name or logo is used as a secondary source indicator rather than as mere ornamentation. *Id.* at 294, n. 6 (citing *Olin, Expo '74,* and *In re Penthouse International Ltd.*, 195 U.S.P.Q. 698 (C.C.P.A. 1977)). Nevertheless, the Board rejected the same argument in a case decided the next year. *See In re Astro-Gods Inc.*, 223 U.S.P.Q. 621, 623 (1984) ("Applicant argues, however, that the designation [ASTRO GODS] as used on applicant's T-shirts, would be perceived by purchasers as a trademark because it corresponds to applicant's corporate and trade name, Astro Gods, Inc. . . . [w]e do not find this argument . . . to be persuasive"). Accordingly, the similarity of WE NOT ME and the corporate name We Not Me, Ltd. cannot alone demonstrate trademark usage to identify a secondary source.

A more useful determinant of whether a mark is merely ornamental or also serves a trademark function is what the Trademark Manual of Examining Procedures calls the overall "commercial impression" of the proposed mark. *See* TMEP. § 1202.03(a). The Board has

identified several key factors in evaluating the overall commercial impression of a mark. "Where

. . . an alleged mark serves as part of the aesthetic ornamentation of the goods, the *size, location,*

*dominance and significance* of the alleged mark as applied to the goods are all factors which

figure prominently in the determination of whether it also serves as an indication of origin." *In*

*re Pro-Line*, 28 U.S.P.Q.2d 1141, 1142 (T.T.A.B. 1993) (emphasis added); *see also* TMEP

§1202.03(a) ("The examining attorney must also consider the size, location, and dominance of

the proposed mark, as applied to the goods, to determine whether ornamental matter serves a

trademark function."). Specifically, "[t]he larger the display relative to the size of the goods, the

more likely it is that consumers will not view the ornamental matter as a mark." *In re Greater*

*Anchorage, Inc.*, Serial No. 77561929, 2011 WL 810198 (February 14, 2011). Another relevant

factor is whether the mark is used in conjunction with "TM" or another symbol indicating

trademark usage. *Cf. In re Wakefern Food Corp.*, 222 U.S.P.Q. 76, 78-79 (T.T.A.B. 1984) ("The

fact that no symbol, such as 'TM' or 'SM,' is used to designate an alleged mark is also some

evidence that the phrase is not being used in a trademark or service mark sense").

       In briefing, adidas cited several cases where the Board determined the uses of phrases

or slogans on t-shirts to be solely ornamental based on analyses of the specific characteristics of

the t-shirts' visual designs. *See Go Pro Ltd.*, 2006 WL 898147 (D. Colo. Apr. 5, 2006)

(embroidering of the phrase "Here Fishy, Fishy" over a large fish hook on T-shirts and hats was

merely ornamental); *In re Dimitri's Inc.*, 9 U.S. P.Q.2d 1666 (T.T.A.B.1998) (word "Sumo" on

t-shirts and hats in connection with stylized representations of sumo wrestlers likely to be

perceived as ornamentation); *In re Astro–Gods, Inc.*, 223 U.S.P.Q. 621 (T.T.A.B.1984) ("Astro

Gods" phrase appearing above depictions of deities serves as part of the thematic whole of

aesthetic ornamentation of t-shirts ). In oral argument, however, adidas continually rebuffed the court's questions about the size, location, and context of WE NOT ME on Bobosky's shirts, hats, and sandals and about whether those factors suggested the mark functioned as pure ornamentation or also served a trademark purpose.  This, of course, is a critical inquiry.

Starting with Bobosky's shirts, I note the overall commercial impression of Bobosky's use of WE NOT ME is only incidentally ornamental and primarily source-identifying. In *Go Pro*, *Astro-Gods*, and *Dimitri's*, the challenged phrases or slogans appeared on the front of shirts in relatively large font along with corresponding images: "Here Fishy, Fish" with a fish hook, "Astro-Gods" with a Greek deity, and "Sumo" with a sumo wrestler. These phrases were prominent and integral parts of the aesthetic ornamentation of the shirts.  By contrast, here the phrase WE NOT ME appears in small print on one sleeve of Bobosky's shirt without any corresponding imagery.  (Feldman Decl., #141, Ex. M).  In fact, other than a medium-size logo over the breast, there is no other design on the shirt whatsoever, reinforcing the notion that WE NOT ME is more likely to function as source identification than aesthetic ornamentation. Finally, the phrase WE NOT ME on the sleeve is followed by a small "®" symbol, providing notice that the phrase is a mark that has been federally registered.  *See* 15 U.S.C. §1111.  Thus, there is at least a question of fact regarding whether the "size, location, dominance and significance" of Bobosky's use of WE NOT ME on t-shirts indicates that the mark serves a trademark purpose. *See Pro-Line*, 28 U.S.P.Q.2d at 1142.

The same conclusion also holds for Bobosky's hats.  WE NOT ME is found on the back of the hats, in somewhat larger lettering relative to the size of the hat than it appears on the t-shirts. (Feldman Decl., #141, Ex. E.)  The front of the hat bears only the WE NOT ME logo,

Page 20- OPINION AND ORDER

appearing much larger than the phrase on the reverse of the hat. Again, the location of the phrase and the smaller font size compared to the logo suggests the phrase is source-identifying as well as ornamental.

Bobosky's flip-flops are somewhat different. There, the phrase WE NOT ME prominently adorns one of two straps on one sandal, while the WE NOT ME logo appears on the other strap, albeit much smaller. No other markings of any kind appear on the sandals. Since the phrase takes up a significant amount of the visible display space on the flip-flops and is the only decoration on an otherwise plain sandal, it appears to function merely as ornamentation. Consequently, there is no triable issue concerning whether WE NOT ME is used in a trademark manner on Bobosky's sandals.

One tangential issue is whether Bobosky's use of WE NOT ME on hang tags and other labeling associated with his shirts, hats, and sandals suffices to create a question of fact regarding whether Bobosky used WE NOT ME to identify source. *See Go Pro*, 2006 WL 898147, at *3 (D. Colo. Apr. 5, 2006) (use of phrase on labels, invoices, advertisements, order forms, and hang tags created question of fact concerning whether plaintiff acquired valid trademark rights under § 43(a)). Bobosky admits that he used WE NOT ME on hang tags only twice for internet sales in 2009 and 2010. (Feldman Decl., #141, Ex. B, at 25.) Moreover, he does not even rely on these tags to demonstrate his acquisition of trademark rights. Thus, Bobosky's very limited use of tags does not independently indicate source-identifying trademark use.

In sum, because Bobosky uses WE NOT ME on shirts and hats in relatively small font at a secondary location without accompanying aesthetic content, there is a genuine issue of

Page 21- OPINION AND ORDER

material fact concerning whether the phrase also serves to identify We Not Me, Ltd. as the secondary source of those items. Thus, adidas is not entitled to summary judgment on Bobosky's unfair competition claim based on trademark infringement.

### III.        Validity of Trade Name

Bobosky insists that his § 43(a) claim also survives summary judgment based on his use of WE NOT ME as a trade name. Trade names are symbols used to distinguish companies, partnerships and businesses, and symbolize the reputation of a business as a whole. *Accuride Int'l, Inc. v. Accuride Corp.*, 871 F.2d 1531, 1534 (9th Cir. 1989). The Lanham Act defines trade names as "individual names and surnames, firm names and trade names used by manufacturers, industrialists, merchants, agriculturalists, and others to identify their businesses, vocations, or occupations . . . ." 15 U.S.C. § 1127. A corporate name is the most common example of a trade name. *See Stork Restaurant v. Sahati*, 166 F.2d 348, 352 (9th Cir. 1948); *McCarthy* § 9:1, at 9-3. Trade names cannot be registered and are therefore not protected under § 32, but actions for trade name infringement can be brought under § 43(a). *Accuride*, 871 F.2d at 1534. Since trade names often function as trademarks, cases usually involve a challenge to both trademark and trade name usage. *Id.* Accordingly, courts apply the same legal principles for both trade name and trademark infringement. *Id.* at 1535.

The problem with Bobosky's trade name theory in this case is that Bobosky's operative complaint does not allege that he possesses rights in a trade name, does not identify his putative trade name, and does not assert that adidas infringed that trade name. Admittedly, Bobosky Third Amended complaint alleges adidas violated §43(a) of the Lanham Act in part by "trad[ing] on Plaintiffs' established goodwill . . . ." (Third Amend. Compl., #101, ¶63.)

Page 22- OPINION AND ORDER

Bobosky's use of the term "goodwill" is somewhat reminiscent of the trade name concept, since a business' goodwill is often tied to its name. But the complaint nowhere uses the words "trade name" and exclusively refers to adidas' infringement of the WE NOT ME "mark." Since Bobosky has not moved to amend his complaint to allege trade name infringement as a basis for his unfair competition claim, I am not prepared to decide whether Bobosky might be entitled to amend to state such a claim.

## CONCLUSION

For the foregoing reasons, defendants' motion for partial summary judgment (#138) is granted in part and denied in part. Although Bobosky's federal trademark registrations are void *ab initio*, there remains a genuine issue of material fact concerning whether Bobosky has established valid rights in WE NOT ME as an unregistered trademark through use of the mark on shirts and hats to identify their secondary source.

Dated this 29ᵗʰ day of December, 2011.

Honorable Paul Papak
United States Magistrate Judge